## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

EMMANUEL I. MEKOWULU,

     Petitioner,

v.

                               **CASE NO. 8:15-cv-1158-T-27MAP**
                               **CRIM. CASE NO. 8:12-cr-170-T-27MAP**

UNITED STATES OF AMERICA,

     Respondent.

_____/

### ORDER

    **BEFORE THE COURT** are Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, memorandum and affidavits in support (cv Dkts. 1, 2-7), the Government's response and affidavits in opposition (cv Dkt. 21), Petitioner's reply and affidavits (cv Dkt. 24), and his supplemental authority (cv Dkts. 11, 12, 25). Upon consideration, Petitioner's motion is DENIED *in part*. An evidentiary hearing is necessary with respect to Petitioner's claims of ineffective assistance of counsel raised in Grounds One B, C, and D.

### Procedural Background

    Petitioner was charged with conspiracy to distribute and dispense controlled substances not for a legitimate medical purpose in violation of 21 U.S.C. §§ 841(b)(1)(C), and 846 (cr Dkt. 1). He was convicted and sentenced to 120 months and three years of supervised release (cr Dkts. 81, 90). The Eleventh Circuit affirmed, finding that there was substantial evidence of guilt. *United States v. Mekowulu*, 556 Fed. Appx. 865, 867 (11th Cir. 2014).

    Petitioner's Section 2255 motion (cv Dkt. 1) raises five grounds for relief:

Ground One: trial counsel were ineffective in failing to:[1]

     A. object to the Government's expert, Professor Doering, testifying to the ultimate issue of Petitioner's guilt or innocence;

     B. call Petitioner as a witness;

     C. retain and call a pharmacist expert to rebut Professor Doering's testimony; and

     D. advise Petitioner on the "deliberate ignorance" jury instruction, thereby rendering Petitioner's waiver of his right to testify unknowing and involuntary;

Ground Two: whether Professor's Doering's standards are unconstitutionally vague rendering the conviction unconstitutional;

Ground Three: the Government's claim that Mr. Mekowulu violated federal law regarding DEA Form 222 violated Mr. Mekowulu's right to be convicted only of crimes charged in the Indictment;

Ground Four: whether Mr. Mekowulu's conviction based on Professor Doering's testimony is a violation of the prohibition of convictions based on *ex post facto* laws; and

Ground Five: whether Professor Doering's testimony and the deliberate ignorance instruction unconstitutionally shifted the burden of proof to the defendant.

## Standard of Review for Ineffective Assistance of Counsel Claims

*Strickland v. Washington*, 466 U.S. 668 (1984), governs Petitioner's ineffective assistance

of counsel claims. *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998):

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

---

[1] At trial, Petitioner was represented by Dale R. Sisco and Franklyn Louderback.

*Strickland* requires proof of both deficient performance and resulting prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). And "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Where, as here, counsel is experienced, the presumption of competence is even higher. *Chandler v. United States*, 218 F.3d 1305, 1314-16 (11th Cir. 2000); *Reynolds v. United States*, 233 Fed. Appx. 904, 905 (11th Cir. 2007).[2] "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," Petitioner must demonstrate that counsel's error prejudiced the defense. *Strickland v. Washington*, 466 U.S. at 691-92. To meet this burden, he must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, at 694-95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

---

[2]Petitioner's trial attorneys are experienced criminal defense lawyers who regularly represent clients before this court. Since 1992, Mr. Sisco has devoted a significant part of his practice representing medical professionals in criminal, administrative, and civil matters (cv Dkt. 21-4, p. 1, ¶ 3). And Mr. Louderback has practiced law for more than 41 years (cv Dkt. 21-5, p. 1, ¶¶ 2, 3).

**Discussion**

**Ground One**

In Ground One, Petitioner asserts four claims of ineffective assistance of trial counsel.

**Ground One A: Mr. Mekowulu's Attorneys Provided Constitutionally Ineffective Counsel Regarding Professor Doering's Testimony.**

Professor Paul Doering was called by the United States as an expert witness. Petitioner contends that counsel were ineffective in: 1) failing to object or move for a mistrial when Professor Doering "exceeded the permissible boundaries of testimony" by repeatedly testifying as to the ultimate question of guilt; and 2) "invit[ing]" Doering "to opine on whether or not something Mr. Mekowulu did was illegal, and then agreed with the expert that the prescriptions were illegal until proven legal by responding, 'okay,' after Professor Doering wrongly made this claim." These contentions are without merit.

"An expert may offer opinion testimony on an ultimate issue of fact. . . ." *United States v. Caro*, 454 Fed. Appx. 817, 843 (11th Cir. 2012) (citing Fed. R. Evid. 704). However, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Accordingly, an expert cannot "expressly stat[e] an opinion as to the defendant's state of mind at the time of the offense. . . ." *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988) (citation omitted).

Before Doering testified, Petitioner's counsel filed a Motion in Limine directed to the scope of Doering's anticipated testimony (cr Dkt. 44). He challenged, among other things, whether Doering could testify on the ultimate issue of Petitioner's guilty knowledge, the existence of "red flags," or

4

"imdicators," which pharmacists should use to identify potential drug diverters and which impose an "affirmative duty" on the pharmacist to inquire into the legitimacy of the prescription. The motion was granted to the extent that Doering was prohibited from offering any "opinions about the ultimate guilt or innocence" of Petitioner, that is, "[w]hether he actually knew or didn't know , , ," But he was permitted to testify to the "red flags," "the indicia, indications that would put a pharmacists on knowledge or at least on alert; however you want to frame it, that these prescriptions - - those purported prescriptions may be illegitimate." (Cr Dkt. 103 at 7-9).

Accordingly, Doering was permitted to testify about "indicators," including, based on hypothetical facts, "pattern prescribing," cash payments, presenting prescription from distant sites, multiple prescriptions for different patients from one doctor presented by one individual, multiple prescriptions for different patients from a distant source, the delivery of prescriptions to a person in a parking lot or on the side of a road or interstate highway, and the receipt of two prescriptions for the same drug for the same person simultaneously or within a day of each other. (Id. at 36 - 42; 44 - 46).

Notwithstanding the ruling on the motion in limine, Petitioner contends that Professor Doering testified several times on the ultimate issue in the case, Petitioner's knowledge of the criminal conspiracy involving diversion of Oxycodone to illicit uses. He argues, with commentary, that the following testimony "can reasonably be construed as a comment on the ultimate guilt or innocence of" Petitioner:

- Professor Doering testified that a person who had a stack of prescriptions in other people's names would be a "deal-breaker," and state[d], "I can't contemplate any legitimate reason that may be."

- Professor Doering directly testified, without objection, that Mr. Mekowulu's

5

filling of two prescriptions back to back was "a huge indicator of diversion." This is not testimony as to a red flag that would put a pharmacist on notice of criminality of others. Instead, this is direct testimony of Professor Doering's opinion that Mr. Mekowulu had personally been involved in diversion.

- on the topic of back to back prescriptions, Professor Doering was allowed to testify, "In fact, there's probably no explanation that would satisfy my concern."

- Professor Doering specifically testified that he would not have honored certain prescriptions, stating, "I wouldn't honor that because I can't think of a valid reason for that to happen[.]"

- Regarding prescriptions for Oxycodone without no [sic] corresponding log sign-out sheet, he stated, "Well, that's a violation of the law. And it would be a further indicator to me that something is going on that would aid or abet diversion of these drugs." This testimony constitutes Professor Doering's opinion that actions of Mr. Mekowulu were a violation of the law and an indicator that Mr. Mekowulu was aiding and abetting the diversion of drugs[.]

(cv Dkt. 2, pp. 11-12).

Considered in the proper context, these snippets of Doering's testimony do not reflect opinions on Petitioner's guilt, that is, that he knew that Oxycodone was being diverted for illicit uses. Although Doering's testimony addressing the indicators was certainly material to the determination of whether Petitioner knew or should have known that the prescriptions he was filling were being diverted for illicit uses, it was not directed to the ultimate question of guilt or innocence. Doering was not asked whether Petitioner knew the drugs were being diverted, and did not express an opinion on that. Rather, to assist the jury in understanding and evaluating the evidence, he expressed opinions, based on his experience, training, knowledge and education, on what he considered to be indicators of drug diversion which should alert a practitioner. Accordingly, since Doering's testimony did not violate Rule 704(b), counsel were not ineffective in failing to object to his testimony or move for a mistrial.

Petitioner further contends that counsel's cross examination of Doering was deficient when he "asked Professor Doering to comment on whether facts that can be attributed to Mr. Mekowulu were illegal, allowed Professor Doering to testify that the burden of proof was shifted to the Defendant and wrongly inform the jury that the prescriptions were illegal until proven to be legal, requiring an explanation, and supports the issue that the Defendant has to testify and offer the explanation." (cv Dkt. 2, pp. 12-13). Petitioner refers to this exchange between defense counsel and Doering:

Q    Okay. Now, you were shown a number of prescriptions for patients that you put on a spreadsheet that the government introduced as Exhibit 69; is that right?

A    That's correct, yes.

Q    And with regard to those prescriptions, you - other than the fact that there were multiple prescriptions issued, and that they were dispensed on simultaneous -- or one day after the -- after the first, that it raises your index of suspicion; correct?

A    That is correct.

Q    Okay. But the fact that that was done in and of itself doesn't make those prescriptions illegal; right?

A    Well, it's kind of opposite of our legal system. To me they're illegal until they're proven legal.

Q    Okay.

A    I'd have to hear a very convincing reason why that was done before I would dispense them.

Q    Okay. Well, you'd need an explanation?

A    Yes, yes, absolutely.

Q    Okay. But as you sit here today, you don't know what was communicated to

Mr. Mekowulu about those; right?

A       That is correct.

Q       All right. Now, you're aware, are you not, that there have been fluctuations in the availability of Oxycodone 30 milligram in the State of Florida?

A       Yes.

Q       There have been some wholesalers or distributors who were not able to distribute Oxycodone 30 for a period of time; is that right?

A       Yes. And I'm biting my lip because -- yes, that's true.

Q       Okay. And a pharmacist can dispense a partial prescription; is that right?

A       That is correct.

Q       Okay. And so let me make sure I understand how that works. If there's a prescription that's issued for a patient, and let's assume that that's a legitimate prescription, there's no indicators in your -- as you've described them. Okay? And that is presented to you as a pharmacist, and you look at what you have in your supply and there are -- you only have 75 available.

A       Yes, sir.

Q       Okay. You could dispense those 75; right?

A       Yes.

Q       And then you would have to dispense the balance, 75 pills, within 72 hours; is that right?

A       That is the law, yes.

Q       And if you didn't dispense the balance of the prescription within 72 hours, the balance of that prescription is void; right?

A       That is correct, yes.

Q       And the patient would have to go back to the doctor and have the doctor issue another prescription; is that right?

A  That's correct.

Q  Your investigation in this case did not include reviewing the availability of Oxycodone 30 during any period of time between June of 2008 and March of 2009; is that right?

A  That's correct.

(cr Dkt. 103, pp. 90-93).

It is apparent from this exchange that counsel was making the point that it is not illegal to dispense Oxycodone to a patient on consecutive days when the supply of Oxycodone is not sufficient to fill the prescription, in an attempt to undercut Doering's testimony that his suspicion of diversion was raised because of the multiple prescriptions dispensed on simultaneous days. And after Doering stated that to him, the prescriptions were "illegal until they're proven legal," counsel brought out that Doering was not privy to "what was communicated to Mr. Mekowulu" about the prescriptions, again, to undercut Doering's testimony.[3] Counsel was therefore able to gain admissions from Doering that (1) a pharmacist is allowed to "dispense a partial prescription" and dispense the balance of the prescription within 72 hours, (2) he did not know what explanation was given to Petitioner, and (3) he made no investigation regarding the shortage of Oxycodone during the relevant period.

As noted, there is a strong presumption that counsel's conduct falls within the "wide range

---

[3] Petitioner's contention that counsel allowed Doering to shift the burden of proof takes Doering's testimony out of context. Indeed, Doering acknowledged the distinction between his perspective on a practitioner's responsibility under the circumstances and the burden of proof in a criminal trial when he testified that "[w]ell, it's kind of opposite of our legal system. To me they're illegal until they're proven legal." That gratuitous statement did not, as Petitioner contends, shift the burden of proof, and certainly cannot be attributed to counsel. Counsel was making the point that filing prescriptions on simultaneous days was not, "in and of itself," illegal. Implicitly conceding the point, Doering acknowledged that he was holding the practitioner to a burden that was inconsistent with the burden of proof applicable to the case. If anything, Doering's testimony reiterated the correct burden of proof.

 And even if the comment was arguably improper, there was no prejudice in light of counsel's argument (see cr Dkt. 105, p. 46) and the court's instruction to the jury (see cr Dkt. 105, pp. 69-70, 81) that the Government had the burden of proof, and Petitioner had no burden to prove anything. *See United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) ("[T]he prejudice from the comments of a prosecutor which may result in the shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof.").

of professional norms." *Strickland*, 466 U.S. at 689. Petitioner has not rebutted that presumption. Counsel's decision on the manner of cross-examination is a strategic decision entitled to deference. *Dorsey v. Chapman*, 262 F.3d 1181 (11th Cir. 2001), *cert. denied*, 535 U.S. 1000 (2002). Counsel's cross examination of Doering and his subtle challenges to the foundation underlying Doering's suspicions was a reasonable strategy which brought out weaknesses in Doering's opinions. *See Minton v. Sec'y, Dep't of Corr.*, 271 Fed. Appx. 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

I therefore find that counsel's cross examination of Professor Doering was reasonable, that is, well within the "wide range of professional norms." And I find that even if, arguendo, counsel's cross examination of Doering was in some way deficient, Petitioner has not shown prejudice. Specifically, counsel's cross examination of Doering did not render the result of the trial unreliable or the proceedings fundamentally unfair, considering the strength of the Government's case.

Petitioner has not demonstrated ineffective assistance of counsel or resulting prejudice with respect to Doering's cross examination.[4] Accordingly, Ground One A is without merit and therefore does not warrant relief.

**Ground One B: Mr. Mekowulu's Attorneys Provided Constitutionally Ineffective Counsel By Resting Without Calling Mr. Mekowulu as a Witness.**

---

[4] To prevail on this claim, Petitioner is required to demonstrate that counsel's strategy was unreasonable, that is, "that no competent counsel would have made such a choice." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998). This he has not done. And the "reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof." *Id.*. Accordingly, Attorney Palmieri's views on the effectiveness of Doering's cross examination and counsel's strategic choices during trial are immaterial (cv Dkt. 6). And finally, the deference to which Sisco's cross examination is entitled "is even greater where those decisions were made by experienced criminal defense counsel." Id.

**Ground One C: Mr. Mekowulu's Attorneys Provided Constitutionally Ineffective Counsel By Failing to Retain and Call a Pharmacist Expert to Rebut the Testimony of Professor Doering.**

**Ground One D: Mr. Mekowulu's Attorneys Provided Constitutionally Ineffective Assistance of Counsel Regarding Mr. Mekowulu's Waiver of the Right to Testify Rendering the Waiver Not Knowing or Voluntary By Failure of Counsel to Advise Mr. Mekowulu on the Deliberate Ignorance Instruction When Advising and Recommending that Mr. Mekowulu Waive the Right to Testify.**

In Ground One D, Petitioner contends that his waiver of the right to testify was not knowing and voluntary because, before waiving his right to testify, defense counsel was ineffective in failing to counsel him on the deliberate ignorance instruction, and by telling him that the case was "in our favor" and "no jury would convict."[5] He asserts that on December 6, 2012, he told Sisco that he would testify (cv Dkt. 3, p. 1, ¶ 6), but on December 11, 2012, Sisco told him and his wife that he and Louderback "had made the decision that [he] would not be testifying[,]" that they "were very comfortable that the case was in our favor" (Id., p. 2, ¶ 8), and that "there was no evidence against [him]." (Id., p. 22, ¶ 22). He further asserts that he "was not advised by Mr. Sisco or Mr. Louderback before [he] advised the court that [he] would not testify that I could be convicted on what I now understand is the 'deliberate ignorance' theory. . . " (Id., p. 3, ¶ 11), and that "Mr. Louderback and Mr. Sisco never, at any time, discussed with me the 'deliberate ignorance' instruction, its meaning, or its implications on whether I should testify." (cv Dkt. 24-1, p. 6, ¶ 5a).

---

[5] "A criminal defendant has a fundamental right to testify in his defense." *United States v. Hung Thien Ly*, 646 F.3d 1307, 1313 (11th Cir. 2011) (citing *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)). "Although often framed as a right to testify, it is more properly framed as a right to choose whether to testify." *Id.* (citing *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc)). That right "is truly protected only when the defendant makes his decision knowingly and intelligently." *Id.* (citation omitted). "In cases where a defendant is represented by counsel, counsel is responsible for providing the advice needed to render the defendant's decision of whether to testify knowing and intelligent." *Id.* (citing *Teague*, 953 F.2d at 1533). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Topete v. United States*, 628 Fed. Appx. 1028, 1029 (11th Cir. 2015) (citing *Teague*, 953 F.2d at 1532-33).

He also contends that counsel "never told [him] why they would like to put [him] on the witness stand, or why they did not want to put [him] on the witness stand," and never asked him how he "would testify. . . in response to any of the government's witnesses . . ." (cv Dkt. 24-1, pp. 4-5, ¶ 4d).

Finally, he avers that had counsel adequately advised him about the "deliberate ignorance" instruction and its implications, he "would have refused to waive [his] right to testify. . . ." (Id., pp. 8-9, ¶ 7). He avers that "[t]here was no reason for [him] to not testify[,]. . .[he had] clear responses to all of the claims of the government witnesses[,]. . .and [he] would have testified. . .that [his] actual belief was that no crime was being committed by Mr. Wubbena or Mr. Ridenour." (Id.).

As for Petitioner's contention that counsel never discussed the deliberate ignorance instruction with him, Sisco avers that "my recollection is that this matter was discussed in detail with [Petitioner] both before and during the trial" (cv Dkt. 21-4, p. 2, ¶ 7), and Louderback avers that "the [deliberate ignorance instruction] was discussed with [Petitioner]." (cv Dkt. 21-5, p. 2, ¶ 10). Both maintain that before Petitioner waived his right to testify, he was aware that the deliberate ignorance instruction would be given, since he was present when the Government argued that the instruction applied and the court announced that the instruction would be given (cv Dkt. 21-4, p. 2, ¶ 8; Dkt. 21-5, pp. 2-3, ¶¶ 10-11). Sisco further avers that "[a]t no time did I ever tell [Petitioner] or his wife that 'there was no way he could be convicted.'" (cv Dkt. 21-4, p. 5, ¶ 16).

Sisco's and Louderback's affidavits indicate that they discussed the deliberate ignorance instruction with Petitioner. Petitioner's affidavit, however, indicates that the instruction was never discussed or explained to him. And there is a factual dispute regarding whether before Petitioner waived his right to testify, Sisco told Petitioner "that no jury would convict anyone with this kind

of evidence. . . ." (see cv Dkt. 4, p. 2, ¶ 5). Finally, counsel do not indicate whether they discussed the advantages and disadvantages of testifying with Petitioner, while he avers that they did not (see cv Dkt. 24-1, p. 4, ¶ 4d).

An evidentiary hearing is necessary on whether Petitioner's waiver of his right to testify was knowing and intelligent, and whether the failure to call him to testify constituted ineffective assistance.[6] *See Aron v. United States*, 291 F.3d 708, 714-715 (11th Cir. 2002) ("[I]f the petitioner alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim.") (citations and internal quotation omitted).

**Ground One C: Mr. Mekowulu's Attorneys Provided Constitutionally Ineffective Counsel By Failing to Retain and Call a Pharmacist Expert to Rebut the Testimony of Professor Doering.**

Petitioner argues that counsel was ineffective in failing to retain a pharmacology expert. He asserts that "there was no reason not to call an expert pharmacy witness for the defense to testify that [he] should not be deemed to be on notice of at least five of Professor Doering's 'red flags.'" (cv Dkt. 2, p. 18). He further asserts that an "expert should have been called to rebut Professor Doering's incorrect claim that blood or marriage relation is required to pick up a prescription for someone else, that Mr. Mekowulu's actions in relation to a log book were a violation of the law, that DEA Form 222 had anything to do with this case, and to rebut the remainder of Professor Doering's testimony." (Id.).

In support, Petitioner submits the affidavit of Dr. Matthew C. Lee, M.D., who is not licensed

---

[6]If, after the evidentiary hearing, it is determined that Petitioner knowingly and intelligently waived his right to testify, Petitioner's claim that counsel was ineffective in failing to call him to testify would necessarily fail, since the decision to testify was ultimately Petitioner's, as he confirmed in the in camera colloquy with the court during trial. (Dkt. 129-6).

in Florida (see cv Dkt. 5). Dr. Lee avers that he was available as an expert witness at the time of Petitioner's trial, his "availability was generally obtainable through common internet searches," and he was not contacted by Petitioner's attorneys (cv Dkt. 4, p. 10). He states that if he had been retained, he would have testified that, in his opinion, Petitioner "should not be deemed to be on notice" of the majority of Professor Doering's "red flags" because they were not "listed criteria in the Florida Administrative Code as [] criteria that shall cause a pharmacist to question whether a prescription was issued for a legitimate medical purpose" (Id., pp. 4-9), and "by 2009 Professor Doering had not published his opinions. . . ." (Id., p. 10).[7]

The decision not to call an expert witness is not, in and of itself, "so patently unreasonable a strategic decision that no competent attorney would have chosen this strategy." *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001). The petitioner must show that, under the circumstances, no reasonable counsel would have chosen to forego an expert, and but for that decision, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687.

Sisco's affidavit indicates, in pertinent part, that:

> I consulted with a number of pharmacy experts regarding his case, including a former member of the Florida Board of Pharmacy; a clinical professor from the University of Florida School of Pharmacy and the Chief Pharmacist at Shands Hospital; and a licensed pharmacist formerly employed by the Drug Enforcement Administration as a Diversion Program Manager. None of these experts were supportive of the

---

[7] That Petitioner's current counsel located an expert (Dr. Lee) willing to testify on Petitioner's behalf does not establish that Sisco's investigation was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. *See also Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.").

Moreover, Dr. Lee is not licensed in Florida and has not practiced in Florida. Consistent with *Gonzalez v. Oregon*, 546 U.S. 243 (2006), the applicable standards of professional practice in this case are to be judged based on the professional standards in Florida. *United States v. Tobin*, 676 F.3d 1264, 1275 (11th Cir. 2012) ("When Congress enacted the CSA, it thus manifested its intent to leave it to the states to define the applicable standards of professional practice.").

dispensing activities of Mr. Mekowulu. The results of these expert consultations were discussed with Mr. Mekowulu.

(cv Dkt. 21-4, p. 3).

It is undisputed that Sisco consulted with several pharmacology experts. He was only required to make a reasonable investigation in his search for an expert. *See Fondren v. Allen*, 2012 U.S. Dist. LEXIS 117189, at *57 (N.D. Ala. Aug. 20, 2012) ("The court's 'principal concern' in deciding whether Fondren's counsel were ineffective for failing to retain an appropriate expert is not whether counsel should have presented expert testimony; rather, it is 'whether the investigation supporting counsel's decision not to introduce [expert testimony] was itself reasonable.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003)). He was not required to continue contacting experts until he found one willing to testify on Petitioner's behalf. *See Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir.), *opinion withdrawn in part on denial of reh'g*, 833 F.2d 250 (11th Cir. 1987) ("We emphasize that the duty is only to conduct a reasonable investigation. Counsel is not required to 'shop' for a psychiatrist who will testify in a particular way."); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998) ("Counsel is not required to continue looking for experts just because the one he has consulted gave an unfavorable opinion.") (quotation marks omitted).

Notwithstanding, Sisco's assertion that "[n]one of these experts were supportive of the dispensing activities of Mr. Mekowulu[,]" without more, is not sufficient to make a determination of whether he conducted a reasonable investigation or that his decision not to retain one of the experts was reasonable trial strategy.[8] Specifically, his affidavit does not provide sufficient detail of

---

[8] In his reply affidavit, Petitioner indicates that Sisco decided not to retain any of the experts with whom he consulted not because they were unsupportive of his "dispensing activities," but rather because the first expert's "integrity would be questioned," the second expert "was unlikely. . .[to] testify," the third expert did "not appear as an expert witness[] anymore," and the fourth expert "was a former DEA agent." (cv Dkt. 24-1, p. 9, ¶ 8).

the results of those consultations to definitively resolve this claim. An evidentiary hearing is therefore necessary on this claim of ineffective assistance of counsel.

**Grounds Two, Three, Four, and Five**

The Government contends that Grounds Two through Five are procedurally defaulted because Petitioner failed to raise those grounds in the district court or on direct appeal (cv Dkt. 26-31). The Government is correct. Since these grounds were available on direct appeal from Petitioner's conviction and he failed to raise them, they are procedurally defaulted.

A claim that was available but was not raised in the district court or on appeal is procedurally defaulted from consideration on collateral review, absent cause and prejudice or actual innocence. *McCoy v. United States*, 266 F.3d 1245, 1258-59 (11th Cir. 2001); *Bousley v. United States*, 523 U.S. 614, 622 (1998). To show cause for not raising a claim, a petitioner must show that "some objective factor external to the defense" impeded his ability to raise the claim previously. *Lynn v. United States*, 365 F.3d 1225, 1235 n.20 (11th Cir.), *cert. denied*, 543 U.S. 891 (2004); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show prejudice, the petitioner must demonstrate that "errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *Wright v. Hopper*, 169 F.3d 695, 706 (11th Cir. 1999) (internal citations omitted). To establish actual innocence, the petitioner must demonstrate factual innocence, not mere legal insufficiency. *Bousley*, 523 U.S. at 623-24. This requires the petitioner to identify new reliable evidence demonstrating actual innocence. *Schlup v. Delo*, 513 U.S. 298, 329 (1995). "The demanding nature of the *Schlup* standard ensures that only the 'extraordinary' case will merit review of the procedurally barred claims." *Melson v. Allen*, 548 F.3d 993, 1002 (11th Cir. 2008) (citing *House v. Bell*, 547 U.S. 518, 538 (2006)).

To the extent Ground Five challenges Doering's testimony and the deliberate ignorance instruction, Petitioner unsuccessfully challenged that instruction on direct appeal. *United States v. Mekowulu*, 556 F. App'x at 868:

> We also conclude that the district court properly instructed the jury on deliberate ignorance. A district court properly instructs a jury on deliberate ignorance when the facts support an inference that the defendant was aware of a high probability of the existence of a fact in question and purposely avoided learning all of the facts in order to have a defense in the event of a subsequent prosecution. (citation omitted). . . Here, the district court instructed the jury that a finding of deliberate ignorance requires proof beyond a reasonable doubt. And nothing in the record undermines the presumption that the jury followed the district court's instructions. Thus, we find no reason to believe the jury convicted Mekowulu on a deliberate ignorance instruction based on insufficient evidence.

Once an issue has been adversely decided on appeal, it cannot be relitigated in a collateral attack under § 2255. *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir.), cert. denied, 531 U.S. 1131 (2001).

To the extent Petitioner purports to raise new claims in Grounds Two, Three, Four, and Five, those claims are procedurally defaulted, and he makes no showing of cause for his procedural default, or prejudice. Nor does he make a showing of actual innocence to overcome his procedural default.

**Petitioner fails to satisfy the cause and prejudice standard**

**Petitioner has not demonstrated that these claims are novel**

Petitioner contends that "the omission on direct appeal of any issues raised herein is the result either of the novelty of the issues or ineffective assistance of appellate counsel." (cv Dkt. 2, p. 34). He therefore contends that cause exists to excuse the procedural default of Grounds Two through Five.

"The novelty of a claim will constitute cause sufficient (when joined with actual prejudice)

to excuse procedural default if the legal basis for the claim was 'not reasonably available to counsel,' *Reed v. Ross*, 468 U.S. 1, 16 (1984)], or if petitioner's counsel 'lacked the tools to construct' the constitutional claim, *Engle [v. Isaac*, 456 U.S. 107, 133 (1982)]." *Pitts v. Cook*, 923 F.2d 1568, 1572 (11th Cir. 1991) (alterations added). "In procedural default cases, the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all." *Lynn v. United States*, 365 F.3d at 1235; *Wallace v. Lockhart*, 12 F.3d 823, 826 (8th Cir. 1994) ("When determining whether a claim is novel, 'the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all.'") (*quoting Smith v. Murray*, 477 U.S. 527, 537 (1986)).

Petitioner's conclusory assertion that Grounds Two through Five are novel does not demonstrate cause for his procedural default. He fails to explain how or why these claims are novel, and more importantly, why these claims were not reasonably available either in the district court or on appeal. In any event, the legal bases for his claims were readily available when he appealed from his conviction. *See Hargrave v. Dugger*, 832 F.2d 1528, 1530-31 (11th Cir. 1987) ("In order to establish the novelty of a constitutional claim sufficient to provide cause, a defendant must initially demonstrate that his situation is one where a court has 'articulated a constitutional principle that has not been previously recognized but which has been held to have retroactive application.'") (quoting *Reed*, 468 U.S. at 17).

Petitioner's legal bases for these claims are: his conviction violates "void-for-vagueness" principles (Ground Two); there was a constructive amendment to the Indictment, since he was convicted of a crime that was not charged in the Indictment (Ground Three); allowing Professor

Doering to testify regarding standards that did not exist at the time of the crime constitutes an unconstitutional *ex post facto* enlargement of the criteria that should cause a pharmacist to question the legitimacy of a prescription (Ground Four); and Doering's testimony coupled with the deliberate ignorance instruction shifted the burden of proof to Petitioner (Ground Five). None of these bases are novel in the context of federal criminal law.

**Petitioner has not demonstrated ineffective assistance of counsel caused the default**

Petitioner alleges, without any supporting facts, evidence, or argument, that ineffective assistance of appellate counsel was the cause for his procedural default of Grounds Two through Five.[9] His conclusory allegation is therefore insufficient to satisfy the cause and prejudice standard. *See Fults v. GDCP Warden*, 764 F.3d 1311, 1318 (11th Cir.2014) ("conclusory allegation [of ineffective assistance of counsel], bereft of details and unsupported by evidence, was insufficient to satisfy the cause and prejudice standard.") (citing *Henderson v. Haley*, 353 F.3d 880, 897 (11th Cir.2003)). Specifically, without argument under *Strickland*, Petitioner fails to demonstrate that appellate counsel's failure to raise Grounds Two through Five on appeal "fell below an objective standard of reasonableness"or otherwise constituted ineffective assistance of counsel. *See Strickland*, 466 U.S. at 688. Moreover, the record demonstrates that he received effective assistance of appellate counsel.

Petitioner was represented by David T. Weisbrod, Esq., on direct appeal (cv Dkt. 21-6). Weisbrod, who has been licensed to practice law in Florida since 1980 (Id., p. 1, ¶ 2), avers that "[a]ll the issues briefed on direct appeal were the result of [his] considered judgment that they had

---

[9] While ineffective assistance of counsel may be cause for a procedural default, *Murray v. Carrier*, 477 U.S. 478, 488 (1986), "attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial." *Id.* at 492.

the best chance for achieving a successful outcome for [Petitioner]." (Id., p. 2, ¶ 5). He filed a thorough and well-reasoned brief on direct appeal (cv Dkts. 21-2, 21-3).

The Sixth Amendment does not require appellate counsel to raise every non-frivolous issue, and even though an issue not appealed might have been successful, the actions of appellate counsel must be viewed in their entirety. *Heath v. Jones*, 941 F.2d 1126, 1131 (11th Cir. 1991). The record therefore demonstrates, and I so find, that Weisbrod's performance was not deficient under prevailing professional norms. *Strickland*, 466 U.S. at 688. Since the bases for Grounds Two through Five were available when Petitioner's direct appeal was filed, and Weisbrod exercised reasonable profession judgment in selecting the issues to raise on appeal, Petitioner has not shown that Weisbrod's failure to raise these grounds on appeal fell below an objective standard of reasonableness Accordingly, this cause argument fails.

Finally, to the extent Petitioner may be arguing that trial counsel was ineffective in failing to preserve these claims for review and that this constitutes cause for his procedural default (see cv Dkt. 2, p. 35; cv Dkt. 24, pp. 17-19), he fails to show that trial counsels' performance was constitutionally ineffective under *Strickland*. The mere failure to preserve a claim for appeal does not establish *Strickland* prejudice. Rather, "the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved.'" *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1269 (11th Cir. 2015) (quoting *Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003) (per curiam)). Petitioner fails to present any argument and otherwise demonstrate that there is a reasonable likelihood that the outcome of the appeal would have been different if trial counsel had preserved these claims for appeal. Grounds Two through Five are therefore procedurally barred from review.

**No credible showing of actual innocence**

Petitioner has not made a credible showing of actual innocence because he presents no new *reliable* evidence of actual innocence. As the Government correctly points out, "[n]one of [Petitioner's] claims raised in either ground would establish [Petitioner's] actual innocence of the charged offense . . ." And to the extent he relies on his own declaration that he is actually innocent and his proposed testimony (cv Dkt. 3), this does not constitute sufficiently reliable *new* evidence of actual innocence, since it was necessarily known to him at the time of his trial. *See, e.g., Hay v. Sec'y, Dep't of Corr.*, 2017 U.S. Dist. LEXIS 123851, at *13 (M.D. Fla. Aug. 4, 2017) ("Pursuant to *Schlup* and its progeny, Petitioner is required to offer new reliable evidence that was not available at the time of his trial."); *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004) ("A defendant's own late-proffered testimony is not "new" because it was available at trial.").

Even assuming that it constitutes "new" evidence, it is self-serving and uncorroborated and therefore does not constitute sufficiently reliable evidence of actual innocence. *See Schlup*, 513 U.S. at 332 (court assessing actual innocence claim may consider "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of [the new] evidence"); *Mize v. Hall*, 532 F.3d 1184, 1198 n. 13 (11th Cir. 2008) ("the [defendant's former girlfriend's] affidavit is of inherently little value because [she] has not been subject to cross-examination as to its contents.") (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)); *Florez v. United States*, 2009 U.S. Dist. LEXIS 63826, at *30, 2009 WL 2228121, at *7 (E.D. N.Y. July 24, 2009) (finding that petitioner's new evidence, in the form of his own testimony, was not sufficient to call into question "sworn testimony subject to cross-examination and upheld on appeal").

Other than his own declaration, Petitioner presents no direct evidence of his actual innocence.

And there was substantial evidence of guilt supporting the jury's verdict. For example, there was testimony that Petitioner: (1) only accepted cash payments for the Oxycodone (cr Dkt. 101, p. 145); (2) told Troy Wubbena to give the prescriptions only to him and not to anyone else at the pharmacy, and would call Wubbena's cell phone to let him know when he was in the pharmacy (Id., pp. 152-53); (3) charged $1.00 to $3.00 per pill when he purchased each pill wholesale for 40 cents to 45 cents per pill, and the average cash price at other pharmacies was 70 to 80 cents per pill (Id., 154-55, 157); (4) allowed Wubbena to help him unpack boxes of Oxycodone, then filled 20 to 30 prescriptions that night (Id., pp. 156-57); (5) did not give Wubbena receipts for the cash payments (Id., p. 158); (6) dropped off large amounts of Oxycodone to Wubbena in various parking lots not typically associated with legitimate pharmaceutical transactions (Id., pp. 161-63); and (7) never called the Pain Center to verify any of the prescriptions (Id., p. 194).

Although Petitioner denies that: (1) he stated he would accept cash only (cv Dkt. 3, pp. 13-14, 19); (2) he never confirmed prescriptions (Id.); (3) his prices for the Oxycodone were not comparable to other pharmacies (Id., p. 17); (4) he told Wubbena to give the prescriptions only to him (Id., p. 19); (5) he allowed Wubbena to unpack boxes of Oxycodone with him (Id., p. 17); and (6) he did not provide receipts (Id., p. 22), he presents no evidence to support his denials. His proposed testimony is little more than an attack on the credibility of Wubbena and Ridenour, and is therefore not new, reliable evidence of his factual innocence.

Because the evidence against Petitioner was strong, I find that a reasonable juror would not, more than likely, accept Petitioner's testimony as credible over Wubbena's and the evidence supporting Wubbena's testimony. In addition, while Petitioner states that the deliveries of Oxycodone he made to Wubbena in parking lots and off an interstate "were made out of genuine

customer service from my heart as I have always done for other people and this one off Interatetate [sic]-4 was because I was heading that way" (Id., pp. 21-22), he presents no other evidence to corroborate this statement. Although he attaches an advertisement from his pharmacy that indicates, in pertinent part, that "if we do not have what you need, when we get it the next day we deliver it to your house unless otherwise requested" (Id., p. 27), he presents no evidence or testimony that he actually delivered prescriptions to customers' homes. And even if he did present such evidence, it would not be helpful, since he was delivering prescriptions for multiple patients to one person in parking lots and along the interstate. Accordingly, I cannot find that it is more likely than not that no reasonable juror would find Petitioner guilty beyond a reasonable doubt had it heard him testify. *Schlup*, 513 U.S. at 324.

I likewise cannot find that it is more likely than not that no reasonable juror would have convicted Petitioner in light of Dr. Lee's affidavit. Dr. Lee's averments do not constitute reliable evidence of *actual innocence,* since they do not establish that Petitioner did not know that the prescriptions he filled were being diverted for illicit uses. Dr. Lee avers that, in his opinion, Petitioner should not be deemed to be on notice of some of Professor Doering's "red flags," since they were not listed in Florida Administrative Code 64B16-27.831 as criteria that would cause a pharmacist to question whether a prescription was issued for a legitimate medical purpose (cv Dkt. 5).[10] But he goes on to say that the criteria in the Florida Administrative Code is not even applicable

---

[10] In 2008-09, Florida Administrative Code 64B16-27.831 provided:

Standards of Practice for the Dispensing of Controlled Substances for Treatment of Pain.
(1) An order purporting to be a prescription that is not issued for a legitimate medical purpose is not a prescription and the pharmacist knowingly filling such a purported prescription shall be subject to penalties for violations of the law.
(2) The following criteria shall cause a pharmacist to question whether a prescription was issued

where a practitioner (as here), rather than patients, may be diverting controlled substances (cv Dkt. 5, p. 3). Nor does he identify any indicators that a practitioner is diverting controlled substances. Finally, he does not aver that Petitioner's dispensing activities with Wubbena and Ridenour were appropriate.

In sum, Petitioner's proffered evidence is not reliable new evidence establishing that he is factually innocent, particularly considering the compelling evidence presented at trial.[11] He has not

---

for a legitimate medical purpose:
(a) Frequent loss of controlled substance medications,
(b) Only controlled substance medications are prescribed for a patient,
(c) One person presents controlled substance prescriptions with different patient names,
(d) Same or similar controlled substance medication is prescribed by two or more prescribers at same time,
(e) Patient always pays cash and always insists on brand name product.
(3) If any of the criteria in (2) is met, the pharmacist shall:
(a) Require that the person to whom the medication is dispensed provide picture identification and the pharmacist should photocopy such picture identification for the pharmacist's records. If a photocopier is not available, the pharmacist should document on the back of the prescription complete descriptive information from the picture identification. If the person to whom medication is dispensed has no picture identification, the pharmacist should confirm the person's identity and confirmation is based.
(b) Verify the prescription with the prescriber. A pharmacist who believes a prescription for a controlled substance medication to be valid, but who has not been able to verify it with the prescriber, may determine not to supply the full quantity and may dispense a partial supply, not to exceed a 72 hour supply. After verification by the prescriber, the pharmacist may dispense the balance of the prescription within a 72 hour time period following the initial partial filling, unless otherwise prohibited by law.
(4) Every pharmacy permit holder shall maintain a computerized record of controlled substance prescriptions dispensed. A hard copy printout summary of such record, covering the previous 60 day period, shall be made available within 72 hours following a request for it by any law enforcement personnel entitled to request such summary under authority of Section 465.017(2), F.S. Such summary shall include information from which it is possible to determine the volume and identity of controlled substance medications being dispensed under the prescription of a specific prescriber, and the volume and identity of controlled substance medications being dispensed to a specific patient.
(5) Any pharmacist who has reason to believe that a prescriber of controlled substances is involved in the diversion of controlled substances shall report such prescriber to the Department of Health.
(6) Any pharmacist that dispenses a controlled substance subject to the requirements of this rule when dispensed by mail shall be exempt from the requirements to obtain suitable identification.

[11]During the sentencing hearing, this court observed, in pertinent part, that "[t]he evidence in this case was compelling. As the presiding judge, I don't see that the jury could have reached anything but the verdict it reached." (cr Dkt. 106, p. 57). And the Eleventh Circuit, in affirming Petitioner's conviction, observed:

demonstrated that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. He is not, therefore, entitled to review of these defaulted claims based on a claim of actual innocence.

Accordingly, Grounds One A, Two, Three, Four, and Five of Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (cv Dkt. 1) are **DENIED**. An evidentiary hearing on Grounds One B, C, and D will be scheduled by separate order.

**DONE AND ORDERED** on December _19ᵗʰ_, 2017.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

---

The Government presented sufficient evidence to support the jury's conclusion that Mekowulu was guilty beyond a reasonable doubt. The jury heard evidence of numerous "red flag" indicators of illegal drug diversion that Mekowulu's coconspirators presented to him. The jury also heard evidence of Mekowulu's own suspicious conduct, including: accepting only cash payments for the prized-on-the-street "blue" Oxycodone pills (R. 101 at 142, 145); charging $1 to $3 per blue Oxycodone pill when he purchased each pill wholesale for 40 cents to 45 cents per pill (R.102 at 155); and dropping off large quantities of Oxycodone to his coconspirators in various parking lots at various times of day not typically associated with legitimate pharmaceutical transactions. (R.101 at 161–62).

*United States v. Mekowulu,* 556 F. App'x at 867.