UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EMMANUEL I. MEKOWULU,

    Petitioner,

v.
    CASE NO. 8:15-cv-1158-T-27MAP
    CRIM. CASE NO. 8:12-cr-170-T-27MAP

UNITED STATES OF AMERICA,

    Respondent.
_____/

## ORDER

An evidentiary hearing was conducted on Grounds One B, C, and D of Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (cv Dkt. 1). Upon consideration, Grounds One B, C, and D of the Section 2255 motion are DISMISSED and Petitioner's Section 2255 motion is DENIED.[1]

### Procedural Background

Petitioner, a licensed pharmacist, was charged with conspiracy to distribute and dispense controlled substances not for a legitimate medical purpose in violation of 21 U.S.C. §§ 841(b)(1)(C), and 846 (cr Dkt. 1). He was convicted and sentenced to 120 months followed by three years of supervised release (cr Dkts. 81, 90). The Eleventh Circuit affirmed, finding that there was substantial evidence of guilt. *United States v. Mekowulu*, 556 Fed. Appx. 865, 867 (11th Cir. 2014).

---

[1] Grounds One A, Two, Three, Four, and Five of the Section 2255 motion were denied in a prior order (see cv Dkt. 33).

**Grounds**

In Ground One B, Petitioner alleges that his attorneys, Dale Sisco and Franklyn Louderback,[2] were ineffective in failing to call him as a witness. In Ground One C, he contends that his attorneys were ineffective in failing to retain a pharmacology expert. And in Ground One D, he alleges that his waiver of his right to testify was unknowing and involuntary because his attorneys: 1) failed to advise him regarding the "deliberate ignorance" jury instruction; and 2) told him that the evidence was in his favor and no jury would convict him.

These claims are readily disposed of. The testimony and evidence presented during the evidentiary hearing demonstrate that: 1) Sisco conducted a reasonable investigation before deciding not to retain a pharmacology expert and his decision not to call one was reasonable; and 2) Petitioner's waiver of his right to testify was knowing and voluntary.[3]

**Standards**

To prevail on these claims of ineffective assistance of counsel, Petitioner must demonstrate that (1) counsels' performance was deficient, and (2) he suffered prejudice as a result of that deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Where, as here, counsel is experienced, the presumption of competence is even higher. *Chandler v. United States*, 218 F.3d 1305, 1314-16 (11th Cir. 2000); *Reynolds v. United States*, 233 Fed. Appx. 904, 905 (11th Cir.

---

[2] Since 1992, Sisco has devoted a significant part of his practice representing medical professionals in criminal, administrative, and civil matters (cv Dkt. 21-4, p. 1, ¶ 3). And Louderback has practiced law for more than 41 years (cv Dkt. 21-5, p. 1, ¶¶ 2, 3).

[3] As discussed below, Petitioner's claim that counsel were ineffective in failing to call him to testify at trial necessarily fails in light of his knowing waiver of his right to testify.

2

2007). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*.

## Discussion

Based on the testimony and evidence presented, I find that Sisco and Louderback's representation did not fall below an objective standard of reasonableness.

### A. Decision not to retain pharmacology expert

Petitioner contends that Sisco was ineffective in failing to retain a pharmacology expert.[4] At trial, the government presented an expert, Professor Doering, who testified about "indicators" which pharmacists should use to identify potential drug diverters and which impose an "affirmative duty" on the pharmacist to inquire into the legitimacy of a prescription. Petitioner contends that the only way to rebut Professor Doering's testimony and the deliberate ignorance instruction was through expert testimony. Although he concedes that Sisco contacted at least four potential expert witnesses, he argues that Sisco's decision not to retain an expert was not based on a reasonable investigation. I disagree.

Sisco contacted four pharmacology experts: Thomas Johns, Robert Parrado, Michael Jackson, and Louis Fisher. Sisco had his associate schedule telephonic calls with Johns and Parrado (Exh. 1). Sisco first spoke with Johns, who he knew from prior professional dealings. While Johns had no recollection of conversations with Sisco about this case, he knew Sisco and has spoken with him several times over the years, possibly on this case.

---

[4]Sisco "was handling the expert witnesses. . . ." (p. 152).

3

Sisco recalled speaking with Johns and having described the facts and issues in the case. He also recalled advising Johns that Doering, a former colleague of Johns, would be testifying for the Government, and that Johns had no problem with that. Sisco recalled:

> I called him, we caught up because we hadn't talked in a little while before that. We talked about another case that he had been involved in he as well as another -- an administrative case in which that I had talked to him about. After we caught up, I talked to him about this case, gave him a little bit of background on Mr. Mekowulu and went over some of the issues, but in particular the issue of these authorizations and one person picking up multiple prescriptions.

(pp. 185-86). Referring to the facts confronting his client, Sisco recalled that "the concept of delivering drugs along the interstate or delivering prescriptions for multiple patients to one person was something [Johns] couldn't get past." (p. 179). Based on their conversation, "[Johns] was not comfortable supporting the conduct of [Petitioner]." (p. 159). Sisco accordingly concluded that Johns' "testimony would [not] be favorable or supportive of Mr. Mekowulu." (p. 186).

Sisco then contacted Parrado. Sisco "had several telephone conversations with him," and sent the government's discovery CD to Parrado to review (p. 135-36; Exh. 2). Parrado confirmed that he reviewed the discovery and after doing so, e-mailed Sisco, stating that "I do not believe I would be able to serve as your expert in this case due to a possible conflict of interest." (p. 9-10; Exhs. 3, 4)). Parrado's "conflict of interest" was that Petitioner's actions contradicted Parrado's teachings and lectures on controlled substances and diversion (p. 10). What concerned Parrado the most in Petitioner's case "was one person presenting at a pharmacy for multiple patients and paying in cash for controlled substances," a 'major red flag."(p. 13). Sisco decided not to retain Parrado "primarily because of his statement to me that he couldn't support the conduct of Mr. Mekowulu." (p. 137).

4

After Sisco sent Petitioner a letter advising him that Parrado was not "comfortable rendering a favorable opinion following his review of the records provided to him" and "was not willing to testify on your behalf,"(cv Dkt. 54-5; Exh. 5), Petitioner suggested that Sisco contact Michael Jackson at the Florida Pharmacist Association (p. 145). Sisco contacted Jackson, but Jackson stated that "he doesn't appear [as an] expert witness anymore." (p. 200). Jackson referred Sisco to Fisher (p. 145).

Sisco contacted Fisher (Id.; Dkt. 54-8, p. 1). Although Sisco did not provide Fisher with documents, he discussed some of the issues in the case with Fisher, including the patient authorizations (Exh. 11) and delivery of the prescriptions to Wubbena (p. 150-51). Based on Fisher's responses to some of his questions regarding the facts confronting Petitioner, Sisco had concerns about hiring Fisher (p. 152), and ultimately concluded that he would not be helpful (p. 178).[5]

According to Sisco, the nature of the evidence compounded the difficulty of finding an expert who could support his client. At some point, he and Louderback discussed with Petitioner whether it would be a better approach, considering the facts, to cross examine the Government witnesses in lieu of calling an expert. And that is the strategic approach Sisco and Louderback took.

An attorney has a constitutional duty only to conduct a reasonable investigation. *Thompson v. Wainwright*, 787 F.2d 1447, 1450 (11th Cir. 1986), *cert. denied*, 481 U.S. 1042 (1987) ("A criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation."). I find without question that Sisco fulfilled that duty by conducting a reasonable investigation into hiring an expert. He contacted and spoke to three pharmacology experts regarding

---

[5] At the hearing, Fisher testified, in pertinent part, that he had no recollection of his conversation with Sisco and what he told Sisco during their conversation (pp. 52-53).

the facts of the case, and none of them were supportive of Petitioner's actions.

Sisco was not required to continue contacting experts until he found one willing to testify on Petitioner's behalf. *See Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir.), *opinion withdrawn in part on denial of reh'g*, 833 F.2d 250 (11th Cir. 1987) ("We emphasize that the duty is only to conduct a reasonable investigation. Counsel is not required to 'shop' for a psychiatrist who will testify in a particular way."); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998) ("Counsel is not required to continue looking for experts just because the one he has consulted gave an unfavorable opinion.") (quotation marks omitted). And the fact that Petitioner now offers an expert willing to testify for him does not establish that Sisco's investigation was unreasonable. *See Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.").

In light of the experts' responses, Sisco's decision not to retain a pharmacology expert and instead aggressively cross-examine the government's witnesses was a sound, strategic one. *See Harrington v. Richter*, 562 U.S. 86, 109 (2011) (decision to cross-examine government expert rather than call defense expert was a reasonable strategy because "sometimes [it] is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates"). Indeed, Sisco and Louderback were successful in many respects in impeaching Professor Doering and the cooperating witnesses, Wubbena and Ridenour, through aggressive cross examination.

In sum, Sisco conducted a reasonable investigation into retaining a pharmacology expert and had a sound strategic reason not to retain one. He therefore was not deficient in failing to hire an

expert. Accordingly, Ground One C does not warrant relief.[6]

**B. Whether Petitioner's waiver of his right to testify was knowing and voluntary**

After the Government rested, the Court conducted an in camera colloquy with Petitioner during which he confirmed his decision not to testify(see cv Dkt. 1-1). Notwithstanding that colloquy, he now contends that his waiver was not knowing and voluntary because his attorneys: 1) failed to counsel him on the deliberate ignorance instruction; and 2) told him that he would not be testifying, since the case was "in our favor" and "no jury would convict."

A criminal defendant has a fundamental constitutional right to testify on his own behalf at trial, a right that cannot be waived by defense counsel. *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc). "A claim that a defendant's right to testify was violated by defense counsel is analyzed as a claim of ineffective assistance of counsel." *Topete v. United States*, 628 F. App'x 1028, 1029 (11th Cir. 2015) (citing *Teague*, 953 F.2d at 1534). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. . . .Counsel may advise the client in the strongest possible terms not to testify, but the choice whether to testify lies with the defendant. . . .Counsel has the responsibility of ensuring that any waiver of the right to testify is knowing and voluntary." *Id.* (internal citations omitted).

During the evidentiary hearing, Louderback and Sisco testified that they had experience trying cases in which the deliberate ignorance instruction was given (pp. 61, 131). Louderback was

---

[6]Because there was no deficient performance, the court need not decide whether Petitioner was prejudiced. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

very "comfortable" with that instruction (p. 62). He recalled explaining the deliberate ignorance instruction to Petitioner during trial at Sisco's office during a lunch break (pp. 83-85). Sisco likewise recalled discussing the instruction with Petitioner and Louderback at his office during lunch that day, and further, that the "[d]eliberate ignorance instruction came up a number of times during [their] conversations. . . ." (pp. 164-65). He believed that when he discussed the instruction with Petitioner, he used "deliberate ignorance" and "willful blindness" interchangeably. (p. 185). Sisco was "confident" that between he and Louderback, the deliberate ignorance instruction was explained to Petitioner "in great detail." (pp. 182, 185).[7]

Louderback testified that he and Sisco discussed the advantages and disadvantages of testifying with Petitioner (pp. 117-18). Sisco specifically recalled meeting with Petitioner during a lunch break in the trial and counseling him on the strategic implications of testifying and not testifying. He and Louderback shared concerns with Petitioner about cross examination and that it would be difficult for him to answer some of the questions he would be asked. But Sisco was adamant that he made it clear to Petitioner that it was Petitioner's decision, and that he did not express an opinion, only things for Petitioner to consider. (p. 163). Sisco also discussed Professor Doering's report with Petitioner and how they could attack his opinions, and reviewed the government's discovery with Petitioner (pp. 168-72, 181).

In Sisco's opinion, he "saw little to be gained from Petitioner's testimony because. . .there was more to lose in the cross-examination." (p. 164). And because Louderback never received satisfactory answers from Petitioner regarding the facts of the case, he was concerned that Petitioner

---

[7]Sisco described Petitioner as educated and intelligent, actively involved in his case, and having asked a lot of questions (pp. 112-14). Petitioner acknowledged having had numerous meetings with his attorneys during the course of the case (p. 176).

8

testifying would "make the case worse" or expose Petitioner to "a guideline obstruction issue." (p. 94). Louderback "had [a] feeling that [Petitioner] wouldn't come across well and that under cross-examination he wouldn't bear up well and that his explanations [in response to the indicators of diversion] to me were not the type of things that a jury would go for." (p. 108). He was certain that he expressed his opinion to Petitioner that his testimony would not hold up well at trial (p. 110). Sisco was certain that he told Petitioner "that there were areas of cross-examination that were going to be dangerous to his case and it would be difficult for him to answer certain questions that [they] anticipated to be presented to him." (p. 164). Specifically, Sisco discussed with Petitioner what his responses would be to the testimony of the government's witnesses (p. 167).

After the government rested on December 6, 2012, Louderback and Sisco met with Petitioner in the conference room outside the courtroom and discussed whether he would testify (p. 97). Louderback testified that Petitioner "was consistent with the idea that he was not going to testify." (p. 98). When they returned to the courtroom, Louderback told the court "we are not going to call him." (cr Dkt. 103, p. 105). Sisco said that at that time it "was very clear that [Petitioner] did not intend to testify." (p. 183).[8]

---

[8] Sisco's and Louderback's responses to the Court's inquiry of whether the defense would present evidence support their testimony that Petitioner had decided not to testify and reaffirmed that decision before the Court engaged him in the colloquy concerning his right to testify:

December 6, 2012:

> Mr. Sisco: We need to just reconfirm with our client, but at this point I don't believe we're going to put on any evidence. (Exh. 10 at p. 102)
> . . .
> Mr. Louderback: From the defense perspective, we're -- we re not going to call him. So we'd be prepared to go with a Rule 29 motion and announce on Tuesday, however you want to do it."

December 10, 2012:

> The Court: . . . You still don't intend to put on a defense, Mr. Sisco?

9

Odini Mekowulu, Petitioner's wife, testified that the weekend before she and Petitioner went to Sisco's office on December 11, 2012, Petitioner was preparing for his testimony, and told her that he was going to testify (p. 190). When they went to Sisco's office on December 11, they sat in the conference room, and she heard Petitioner say that he was going to testify (p. 191). According to her, Sisco responded that there was no need for him to testify because "they have it under control and that no juror will convict him because they have the case." (p. 191).

According to Petitioner, on December 6, 2012, after trial recessed for the night, he went to Sisco's office and told Sisco that he wanted to testify (p. 213). Sisco asked him if he had ever

---

Mr. Sisco: At this point we still do not intend to do that. I haven't heard from my client that he's changed his mind.
The Court: Well. In the morning before we get started, I will conduct a sidebar colloquy in camera to ensure that's his decision . . .

December 11, 2012:

THE COURT: All right. I think under the circumstances, I should conduct a brief colloquy at sidebar with counsel and their client.
(At which time the following sidebar discussion was held: )
THE COURT: Good morning, sir.
THE DEFENDANT: Good morning.
THE COURT: his discussion will be sealed, in other words, it would not be accessible. to anyone without an order from me.
THE DEFENDANT: Okay.
THE COURT: What I want to make sure of is that you understand you have the right to testify and you also have the right not to testify.
THE DEFENDANT: Yes.
THE COURT: And that this decision is yours and yours alone to make, after conferring with your lawyers.
THE DEFENDANT: Yes.
THE COURT: Do you have any questions about your. rights?
THE DEFENDANT: No.
THE COURT: Is it your decision to testify or not to testify?
THE DEFENDANT: Not to testify.
THE COURT: All right. And that is your decision?
THE DEFENDANT: Yes, sir.
THE COURT: All right. Thank you. THE DEFENDANT: Yes, Your Honor.
(At which time the sidebar discussion was concluded and the proceedings resumed as follows:)

10

testified before, explained the process of testifying, and informed him that another client who was a doctor had testified on his own behalf in another case and "it worked." (p. 213). Petitioner left Sisco's office with the impression that he would be testifying (p. 214). That weekend, he prepared for his testimony (Id.).

Petitioner testified that on the morning of December 11, 2012, he and his wife went to Sisco's office (p. 216). Petitioner asked Sisco:"I'm testifying today, right?" (Id.). Sisco responded that he and Louderback had decided that he would not testify "because they [were] comfortable where the case is. . . ." (Id.). According to Petitioner, he said "okay," but reiterated that he wanted to testify (Id.). Sisco stated something to the effect that they did not want him to testify and make mistakes (p. 217).[9] Notwithstanding, when asked during the evidentiary hearing what his understanding of whose decision it was as to whether he would testify, Petitioner answered: "Well, I was following my attorney's advice. I want to testify, but also I realize that their advice is important, but my decision was that I want to testify." (p. 218). Of course, the in camera colloquy the Court conducted with Petitioner belies this testimony.

While Sisco had no recollection of meeting with Petitioner on the morning of the final day of trial (December 11, 2012) and being told by Petitioner that he wanted to testify, Sisco was adamant that if Petitioner had told him that, he would have informed the court that Petitioner had changed his mind and wanted to testify (p. 174 - 75). And Sisco denied having told Petitioner or Petitioner's wife that "the case was going in [their] favor and that no jury would convict[.]" (p. 184). In fact, Sisco has never said that to a client (Id.).

---

[9] According to Petitioner, at the end of the trial, ha and Sisco had "a very heated argument" "because [he] was very upset with [Sisco] for not allowing [him] to testify." (pp. 216-17).

11

Petitioner testified that Sisco and Louderback never talked to him about the deliberate ignorance instruction (pp. 220-22). He stated that the first time he read and understood that instruction was when he read the appellate court decision (p. 220). He also testified that had the instruction been explained to him, he would not have waived his right to testify (pp. 221-22). He denied that during trial, his attorneys asked him how he would testify in response to the government's witnesses (pp. 8-9). He also testified that his attorneys never counseled him regarding the advantages and disadvantages of testifying (pp. 30, 33, 219-20). He claimed that before the trial started, he anticipated that he would testify, and never told Sisco that he would not be testifying (p. 204).

Petitioner's testimony that Sisco and Louderback never explained the deliberate ignorance instruction to him or discussed the advantages and disadvantages of testifying is not credible. Sisco and Louderback both specifically recalled counseling Petitioner regarding the deliberate ignorance instruction during trial in Sisco's office over lunch. Sisco was certain that the instruction was explained to Petitioner "in great detail." Sisco and Louderback are experienced criminal defense attorneys who have tried numerous cases involving the deliberate ignorance instruction. Their testimony that they discussed the deliberate ignorance instruction with Petitioner is credible, and persuasive.

Petitioner's testimony that the first time he read and understood the deliberate ignorance instruction was when he read the appellate court's decision is not believable. He is an intelligent, educated individual who was actively involved in his defense. The instruction was discussed with Petitioner by his attorneys, and he was present during the charge conference when the instruction was extensively discussed and during which Mr. Louderback objected to the instruction and argued that

12

it should not be given (see cr Dkt. 103, pp. 135, 143-48). It therefore defies logic that Petitioner was not aware of and did not understand the deliberate ignorance instruction until after he appealed his conviction.

Likewise, Petitioner's testimony that Sisco and Louderback never counseled him regarding the advantages and disadvantages of testifying is not credible. Sisco and Louderback testified that they discussed the advantages and disadvantages of testifying with Petitioner, and I find their testimony credible. Moreover, at the critical point when Petitioner had to decide whether to testify, they discussed the advantages, disadvantages, and risks of testifying with him, including the difficult questions he would be asked on cross-examination. Even Petitioner acknowledges that they had concerns that he would make mistakes while testifying, and that his testimony may not be well received by a jury. Additionally, Louderback testified that he was concerned that if Petitioner testified and made mistakes, it could expose him to a sentencing enhancement for obstruction of justice for testifying falsely under oath.[10]

It is apparent from their testimony that Sisco and Louderback extensively discussed with Petitioner the evidence as they expected it to be, including Professor Doering's report and anticipated testimony. Petitioner acknowledges that his attorneys discussed the government's discovery and Professor Doering's report with him. He acknowledges that they provided him with a copy of Professor Doering's report. And it is undisputed that Sisco advised Petitioner that he was having difficulty finding an expert to support his actions (see Exh. 5). Sisco and Louderback "absolutely" discussed with Petitioner the evidence as it was presented during the course of the trial, and met

---

[10] Indeed, having heard Petitioner's explanations for his conduct, I find that those concerns were well founded, as his explanations lacked credibility.

13

regularly with him during the course of the trial.

I further find that Petitioner and his wife's testimony that Sisco told Petitioner that he and Louderback decided Petitioner would not testify because the case was in their favor and no jury would convict him is not credible. Sisco unequivocally denied making that statement, and I find his testimony credible. He explained that in all of his years of practicing law, he has never made a statement like that to a client because he has "done this too long" and "been surprised too many times." (p. 184).

If Petitioner had actually decided that he wanted to testify, but believed his attorneys had decided that he would not, he would not have responded as he did during the Court's colloquy regarding the his right to testify.[11] The colloquy demonstrates that Petitioner understood that he had the right to testify or not to testify, and that he knew the decision was his alone to make, and that he had no questions about those rights (cv Dkt. 1-1, p. 3). He informed the court that his decision was not to testify, and that the decision was his decision (Id., pp. 3-4). His testimony that he had actually decided to testify, but that Sisco made the decision that he would not testify is entirely inconsistent with his responses to the Court's in camera colloquy and not credible. *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) (explaining that statements made under oath in open court "carry a strong presumption of verity," and therefore present "a formidable barrier in any subsequent collateral proceedings").

Finally, to the extent Petitioner implicitly argues that his attorneys should not have discouraged him from testifying, they had such a duty if they believed that it was the wiser course

---

[11] As noted, Petitioner is a highly educated and intelligent man, was actively involved in his own defense, and asked questions of his attorneys if he did not understand something.

of action. *Teague*, 953 F.2d at 1533. As discussed, Sisco and Louderback expressed to Petitioner sound reasons why he should not testify.

In sum, considering the testimony and evidence presented and the colloquy the Court engaged in with Petitioner concerning his right to testify, I find that he made a knowing and voluntarily decision not to testify, after having conferred with experienced defense counsel about the advantages and disadvantages of testifying, both of whom expressed legitimate doubts that testifying would be beneficial. Accordingly, he has not shown that his waiver of the right to testify was the product of ineffective assistance of counsel. Accordingly, Ground One D does not warrant relief.

## C. Failure to call Petitioner to testify

Petitioner contends that counsel were ineffective in failing to call him as a witness. He argues that they should have called him so he could explain his conduct and why he believed Wubbena and Ridenhour were not diverting the oxycodone to illicit use. This claim necessarily fails because, as discussed, Petitioner knowingly and voluntarily waived his right to testify.

He was well aware that it was his decision, alone, whether to testify, and he affirmed that understanding during the Court's colloquy. Sisco and Louderback could not have overridden that decision. *Cf. Johnson v. Cain*, 712 F.3d 227, 232 n.2 (5th Cir. 2013) ("It is deficient performance as a matter of law for defense counsel to override the ultimate decision of a defendant to testify contrary to his advice.") (citation and internal quotation marks omitted). Petitioner therefore cannot now claim ineffective assistance of counsel because they did not call him as a witness. *See McElvain v. Lewis*, 283 F. Supp. 2d 1104, 1118 (C.D. Cal. 2003). Accordingly, Ground One B does not warrant relief.

Petitioner's motion to vacate (cv Dkt. 1) is therefore **DENIED**. The **Clerk** shall close this

15

case.

## Certificate of Appealability

To appeal this decision *in forma pauperis*, Petitioner must apply for and obtain a Certificate of Appealability. He "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Drake*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

**DONE AND ORDERED** on March 6th, 2018.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record